**In the**
**UNITED STATES DISTRICT COURT**
**for the SOUTHERN DISTRICT OF INDIANA,**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| CHERYL D. SQUIRES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| *vs.* | ) | **CAUSE NO. 1:05-CV-1121-SEB-VSS** |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**E N T R Y**

In this cause, the plaintiff seeks judicial review of the defendant Commissioner's denial of her claim for Social Security disability benefits.  Plaintiff applied for benefits under both the insurance and supplemental income programs of the Social Security Act.  After her application was denied by the state agency on initial and reconsideration reviews, (R. 160, 161, 312, 313), Plaintiff requested and received a hearing before an administrative law judge ("ALJ") of the Social Security Administration ("SSA").[1]  She testified at the hearing as did a medical and a vocational expert and Plaintiff was represented by counsel.  The ALJ found that Plaintiff was not disabled and not due benefits under the Act.  The SSA's Appeals Council denied Plaintiff's request for review of that decision which rendered the ALJ's finding the final administrative

---

[1] For benefit applications filed in Indiana, the initial and reconsideration decisions are performed by an agency of the state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration, under arrangement with the Social Security Administration.  20 C.F.R. Part 404, Subpart Q.  Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the Social Security Administration.

decision on her claim and his written explanation the one that we review.

In her application papers and at the hearing, Plaintiff asserted that she became disabled on September 29, 2002, the last day that she worked, because of limited motion and use of, and pain and numbness in, her right arm and elbow, (R. 195-96, 199, 210-11, 218, 236-37, 333, 336), her left arm, elbow, and hand, (R. 199, 332-33), and because of a problem with her knees, (R. 333).  She claims that these problems limit her ability to lift with her right arm, bend her right elbow, (R. 334, 335), and engage in fine-motor manipulation of her right hand and fingers, (R. 336).  She also limps, (R. 333, 334-35), and the duration of her standing, walking, and sitting is limited, (R. 334-35, 336).

In February  2001, Plaintiff was examined for complaints of knee pain.  Rehabilitation therapies, continued anti-inflammatory medication, and a knee sleeve were recommended.  (R. 44-45).  The record shows that she began seeking treatment for tingling and numbness in her arms and hands, left greater than right, and shoulder pain in February 2002.  She had several follow-up visits over the next months.  After testing, the medical impressions were bilateral ulnar[2] and median[3] peripheral neuropathic processes, most likely impingements of both arms and

---

[2] Of or pertaining to the ulna, the longer of the two bones of the forearm.  6 J. E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* (hereinafter "*A. D. M.*"), pp. U-7 and U-8 (Dec. 2005).

[3] The median nerve is "[a] nerve taking origin in the fifth, sixth, seventh, and eighth cervical or neck segments of the spinal cord and also in the first thoracic or chest segment.  It is widely distributed to the . . . long muscles of the forearm which flex (bend) the fingers and the hand, the skin on the thumb side of the palm and of the first, second, and third (thumb, index, and middle) fingers, and the radial half (half facing the thumb) of the fourth finger (ring finger). It also innervates the intrinsic muscles of the hand . . . ." 4 *A. D. M.*, p. M-89.

shoulders with fewer symptoms in the left arm; cubital tunnel syndrome of the left arm; carpal

tunnel syndrome in both arms, less severe in the right arm; and possible nerve lesion.  She was

treated with forearm braces and anti-inflammatory medication.  (R. 57- 62).

Dr. Tumuluri, a surgeon, began seeing Plaintiff in July 2002 for the same complaints and

he diagnosed her with cubital tunnel compression neuropathy[4] of her right arm and carpal tunnel

compression neuropathy[5] of her right hand.  (R. 63-66, 75).  On October 1, 2002, he performed a

---

[4] The cubital tunnel is "[i]n the front of the elbow, the opening between the two heads of the flexor carpi ulnaris muscle . . . through which the ulnar nerve passes to the forearm."  2 *A. D. M.*, p. C-516 (Dec. 2005).  The ulnar nerve is "[a] motor (muscle-stimulating) and sensory nerve distributed to the skin of the little finger, the ring finger, and part of the hand (on the side of the little finger) . . . .  A motor nerve activates muscles; it causes muscles to contract.  A sensory nerve conducts impulses of feeling, as pain, temperature."  6 *A. D. M.*, p. U-9.  Cubital tunnel syndrome is "[t]he condition resulting from a compression or injury of the ulnar nerve at the elbow.  . . .  It is marked by pain and numbness in the medial side (on the same side as the little finger) of the forearm and hand.  Also called *ulnar nerve entrapment*."  2 *A. D. M.*, p. C-516.  Entrapment neuropathy is a "[d]isease of nerves resulting from compression as in passing through a fibrous tunnel."  4 *A. D. M.*, p. N-88.

[5] The carpal tunnel is "[a] space in the deep tissues of the palmar or palm surface of the wrist, i.e., the surface of the wrist which is on the same side as the palm of the hand.  The space is located between the carpal bones (the small bones of the wrist) and the band of tough tissue known as the *transverse carpal ligament* . . . .  This space or tunnel provides a passage for several tendons of the muscles which flex or bend the fingers and thumb.  In addition, the median nerve passes through this tunnel."  1 *A. D. M.*, pp. C-94 to C-95.  Carpal tunnel syndrome is "[a] condition resulting from pressure on the median nerve as it traverses the carpal tunnel . . ., usually by fibers of the transverse carpal ligament.  The condition is characterized by pain, tingling, burning, numbness, etc. in the areas supplied by the nerve, i.e., in the skin of the palm, fingers, wrist, etc.  There may also be swelling of the fingers and atrophy of some of the muscles of the hand, especially those at the base of the thumb."  *Id.*, p. C-95.

decompression,[6] neuroplasty,[7] and medial epicondylectomy[8] of the cubital tunnel of her right arm and a decompression of the carpal tunnel of her right hand.  (R. 75).

Plaintiff reported pain, burning, and a limited range of motion in her right elbow after the surgery.  Dr. Tumuluri suspected reflex sympathetic dystrophy[9] and referred her to a pain clinic for evaluation; he nonetheless released her for work on November 6, 2002 with the restriction of no lifting with her right arm until further orders.  (R. 87).  The pain clinic prescribed physical and occupational therapy.  In his note of her November 25, 2002 clinic visit, Dr. Fleck, the treating clinic physician, recorded that Plaintiff reported that her pain was almost completely gone since she began the therapy, rating it a 0 out of 10.  However, he noted that she still had reduced active and passive range of motion of her right elbow even with the therapies.  Dr. Fleck recommended against any additional pain treatments, recommended continued physical and occupational therapy, and decided to await the results of an upcoming second-opinion evaluation that Plaintiff had scheduled with Dr. Whitaker, an orthopaedic surgeon.  (R. 90-91).

---

[6] "The relief of constriction of or pressure on a nerve by surgical means."  4 *A. D. M.*, p. N-58 ("nerve decompression").

[7] "A plastic surgical operation on a nerve or nerves."  4 *A. D. M.*, p. N-89.

[8] The medial epicondyle of the humerus is the "epicondyle (bony projection) from the medial (inner) side of the lower end of the humerus (bone of upper arm)."  2 *A. D. M.*, p. E-140. A piece of Plaintiff's medial epicondyle was removed, the area smoothed, and bone wax applied. (R. 76).

[9] "A group of symptoms that sometimes follow[s] an injury to an upper or lower limb. The symptoms include unduly prolonged or intense pain that persists long after the injury has healed, skin redness, delay in recovering the function of the limb, and changes in the bone and skin suggestive of an interruption in the nerve supply or nutritional blood supply."  5 *A. D. M.*, p. R-68.

Dr. Whitaker examined Plaintiff on December 9, 2002 and performed x-rays of her right elbow.  He noted that she reported right-elbow stiffness, some color changes in the right hand, and that her right hand feels cold.  No complaints of pain were noted.  Dr. Whitaker reported to Dr. Tumuluri that she had hyperhidrosis[10] in the right palm, normal appearance on the left; less grip strength in the right hand than the left; and that her x-rays of the right elbow were negative. His impression was sympathetic overdrive or sympathetic mediated pain syndrome,[11] and hyperactivity of the sympathetic nervous system.[12]  He recommended stellate ganglion blocks[13] and continued therapy.  (R. 48-49).  Plaintiff received the ganglion blocks.  (R. 54).

On December 18, 2002, Dr. Tumuluri wrote a "Certificate to Return to Work or School" stating that Plaintiff was able to return to work on December 23, 2002 with "partial use" of her right arm.  (R. 105).  On December 19, 2002, Plaintiff advised Dr. Tumuluri's office that she was fired from her job when she did not return to work on the advice of her physical therapist and requested a statement that she had been under the doctor's care until December 18, 2002.  Dr. Tumuluri communicated to Plaintiff that he wrote his November 6, 2002 note releasing her to

---

[10] "Excessive sweating; the tendency to sweat readily."  3 *A. D. M.*, p. H-233.

[11] Same as reflex sympathetic dystrophy, defined above, note 9.  5 *A. D. M.*, p. S-426.

[12] A system of three groups of nerves:  (1) nerve fibers emerging from the central nervous system (brain and spinal cord), which connect to (2) nerve ganglions (groups of nerve cells on the side of the spine), which connect to (3) nerve fibers distributed to the organs.  "The function of this system is generally opposite to that of the parasympathetic nervous system.  Thus, if a sympathetic nerve stimulates a gland to greater activity, the parasympathetic nerve tends to decrease the activity."  5 *A. D. M.*, p. S-427.

[13] "The injection of an anesthetic solution into the stellate or cervicothoracic ganglion, to block the nerve impulses coming through it."  5 *A. D. M.*, p. S-288 to S-289.  "Cervicothoracic" means pertaining to or involving the neck and chest.  1 *A. D. M.*, p. C-176.

work with a no-right-arm-lifting restriction after discussing the benefits of a return to work with

her, that she agreed with him, and that patients should listen to and follow their doctors'

instructions.  (R. 70)  Plaintiff contacted Dr. Tumuluri's office the next day, December 20,

2002, asking for another statement of her work restrictions.  Staff contacted the absent Dr.

Tumuluri, noted his instruction that Plaintiff was limited to lifting no more than 5 pounds for an

unknown time period, (R. 71), and apparently appended this restriction to the doctor's previous

December 18, 2002 return-to-work note, (R. 105).  After seeing Plaintiff again on December 23,

2002, Dr. Tumuluri wrote two additional return-to-work notes, one stating that she could return

to work with "partial use" of her right arm starting that day and the other note stating that she

can use her right arm and can lift up to "15 lbs (FIFTEEN)."  (R. 71, 106, 108).[14]

Plaintiff apparently informed Dr. Tumuluri on January 6, 2003 that she had no elbow

improvement and he again referred her to Dr. Whitaker.  (R. 71).  Dr. Whitaker saw her a second

time on January 20, 2003 and his impression was post-operative contracture of the right elbow.

He had no additional recommendations, did not intend to see her again, recommended continued

home exercises, and opined that she could return to work with a twenty-pound lifting restriction

with the right arm.  (R. 54).

Plaintiff applied for Social Security disability benefits on March 10, 2003.  (R. 233, 236).

The SSA scheduled a consultative examination with Dr. Henderson on April 28, 2003.

---

[14] An office note for June 18, 2003 records that Plaintiff contacted Dr. Tumuluri's office
asking him to change her lifting restriction to 5 pounds "to help her get disability."  The note
records that the doctor agreed.  (R. 73).

(R. 205-06).  At his examination, Plaintiff reported significant pain of both hands with aching of fingers accompanied by numbness, inability to extend her elbow after surgery, inability to flex more than about 20-30 degrees, and no significant improvement with therapy.  She stated that she cannot return to work as a cook.  Following examination, Dr. Henderson reported that Plaintiff had "marked decreased strength" in her right arm at a "grade 2/5 and on the left a grade 5/5"; decreased grip strength in the right hand at a "grade 2/5 and on the left a 5/5"; inability to use her right hand to perform fine finger manipulation including buttoning, zipping, and picking up coins, but normal function in the left hand.  His final assessment was "[f]ixed right elbow secondary to poor surgical outcome of a cubital tunnel release surgery" and his recommendation was that Plaintiff "should be considered not able to perform all the usual activities of daily living."  (R. 265-67).

Plaintiff began visiting Wishard Memorial Hospital on November 3, 2003 for evaluation of her right elbow.  On that day, she complained of prolonged and increased stiffness of her right elbow.  Physical examination showed decreased passive and active range of motion:  flexion to 90-100 degrees and extension to 30-40 degrees.  The physician, Dr. Weeks, found the stiffness unusual for over one year after surgery.  X-rays showed no bone abnormalities.  He noted that Plaintiff probably needed triceps lengthening or release and anticubital release to regain her range of motion.  (R. 119).  During her second visit on February 6, 2004, Plaintiff reported that she had no pain and was not taking pain medication.  X-rays showed degenerative changes in the right elbow consisting of joint space narrowing, subchondral sclerosis,[15] and marginal

---

[15] Hardening of tissue beneath cartilage or gristle, especially as applied to hardening which results from an abnormal increase in fibrous tissue ordinarily present in small amounts in

osteophyte[16] formation which were unchanged from the x-rays taken on her first visit on November 3, 2003.  Dr. Weeks noted that Plaintiff would need extension elbow release with post-operative therapy and recommended that she return in two to three weeks for further discussion regarding surgery.  (R. 121-22).  On February 27, 2004, Plaintiff's range of motion was recorded at 30 to 85 degrees and she again reported no pain or use of pain medication.  Dr. Weeks recommended elbow release surgery before the end of March.  (R. 123).

Plaintiff underwent a right elbow contracture release and left elbow neuroma[17] excision on March 23, 2004 at Wishard Hospital.  During the surgery, after the release was performed, the surgeon manipulated her elbow to a range of motion of 1 to 125 degrees.  (R. 124-26).

In his report of a July 2, 2004 follow-up visit with Plaintiff, the surgeon recorded her report that she had no improvement in her right elbow's range of motion which remained minimal at 30 degrees.  She was taking ibuprofen and vicodin and reported no pain.  She did not want further surgery and the surgeon's impression was that further therapy at that point would not be helpful for her.  (R. 145).  Dr. Chrysopoulo, a hand and upper extremity surgeon, reported to Plaintiff's attorney on July 2, 2004 his diagnosis of right-elbow contracture and his prognosis that there would be no improvement in her right elbow range of motion but that she could "use her right arm as tolerated but limit heavy lifting (to 10 lbs.)."  (R. 133).

various parts of the body.  5 *A. D. M.*, pp. S-63 (sclerosis) and S-337 (subchondral).

[16] "An outgrowth of bony tissue from a bone; an osteophyma; a spur of bone."  4 *A. D. M.*, p. O-122.

[17] "A general term for a tumor arising from nerve tissue, i.e., from the nerve cells proper , as opposed to the connective or supporting tissue, as a ganglioneuroma.  . . .  Also, a nonspecific term for a tumor of any part of the nervous system . . . ."  4 *A. D. M.*, p. N-83.

Plaintiff returned to the hospital on July 6, 2004 complaining of knee pain. The doctor found possible suprapatellar[18] swelling, a full range of motion, no effusion,[19] and no tenderness. X-rays were ordered to rule out a diagnosis of degenerative joint disease. The x-rays performed on the next day showed mild osteoarthritis which was not advanced for her age, (R. 134, 146-50), also described as minimal degenerative joint disease, (R. 151). X-rays performed on September 2, 2004 were interpreted as negative for her right and left knees, little change from the July 7, 2004 films, and indicating no evidence of arthritis. (R. 153 ("Bones, soft tissues, and joint spaces are intact. No fractures, dislocations, bone destruction, or evidence for arthritis. No patellar subluxation."[20]).

On May 5 and October 16, 2003, as part of the initial and reconsideration reviews of Plaintiff's benefits application, a state agency physician and a state agency disability examiner determined, based on a review of the documentary evidence on file at the time, that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in a workday; push and/or pull with no limitation; occasionally climb ramp, stairs, ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; she had no limitations on manipulation (including reaching, handling, fingering, and feeling), vision, communication, or environment.

---

[18] "Situated above the patella or kneecap." 5 *A. D. M.*, p. S-402.

[19] "1. An oozing of fluid from a tissue. 2. The oozing of fluid from a tissue into a body cavity, an organ, etc. 3. The escape of fluid into a tissue, as in the process of swelling. 4. The fluid escaped or accumulated by effusion, especially in a confined space, as the abdomen or chest." 2 *A. D. M.*, p. E-30.

[20] Subluxation is "[a] dislocation of a bone which is less than complete, i.e., a partial dislocation." 5 *A. D. M.*, p. S-347.

9

They specifically noted, however, that "the claimant's allegations appear credible" regarding symptoms alleged by the claimant to produce physical limitations and regarding the severity of her alleged symptoms and their effect on function.  They also noted that there were no treating or examining source statements regarding the claimant's physical capacities in the file at the time of their evaluations.  (R. 271-78, 312, 313).

At the hearing on December 3, 2004, Plaintiff testified that the operations did not clear up the problems with her right hand and elbow, leaving them about the same as before the operations, (R. 332); that she has pain and numbness in the middle of her left elbow, shooting down to her hand, the same as in her right arm, (R. 333); and that she has problems with both of her knees, the left worse than the right, which cause her to limp, (*id.*).  She stated that she cannot bend or straighten her right elbow because of stiffness and pain, (R. 334), and she can lift only 10 pounds, without specifying with which arm, (R. 335).  She has problems using her right hand and manipulating her fingers and she has numbness in the right hand, which is weaker than her left hand.  (R. 336).  She claimed that knee pain limits her standing to 15 minutes and her walking to half of a block.  (R. 334-35).  Aches in both legs limit her sitting to 10 or 15 minutes at which point she must stand and move around.  (R. 335).

Dr. Lorber, board-certified in orthopaedic surgery, testified as a medical expert at the hearing and previously submitted a written report.  He agreed with the initial and reconsideration agency assessment of Plaintiff's functional capacity as far as lifting, standing, walking, and sitting.  He found that she was more restricted in some areas than the agency's reviewers assessed:  his opinion was that Plaintiff can only occasionally pull and/or push with her right

arm; can less-than-frequently perform power gripping with her right arm; can only infrequently push and/or pull with her right arm; should never climb ladders, ropes, or scaffolds; and should avoid using vibrating tools with her right arm.  He also found that she was less restricted than the agency's assessment in that she can frequently climb ramps and stairs, stoop, kneel, and crouch. He otherwise agreed with the agency's assessments. (R. 296-305).  Dr. Lorber disagreed with Dr. Henderson's opinion that Plaintiff is not able to perform all the usual activities of daily living and that she is unable to perform fine motor functions because he found no basis in Dr. Henderson's report or in other record evidence for those opinions. He concluded that she does not meet the criteria of Listing 1.02.  (R. 296-305, 337-52).

## Standard

Our standard of review is a deferential one:  courts must uphold decisions of the Commissioner if her factual findings are supported by substantial evidence in the record and no material error of law has occurred.  42 USC § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence.  *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004).  This limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations.

In reviewing the decision of the ALJ, we cannot engage in our own analysis of

11

whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.  Our task is limited to determining whether the ALJ's factual finds are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  *Carradine*, 360 F.3d at 758.

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months".  42 USC §§ 423(d)(1)(A) and 1382(a)(3)(A).[21]  A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 USC §§ 423(d)(2)(A) and 1382c(a)(3)(B).  The combined effect of all of a claimant's impairments shall be considered throughout the disability determination process.  42 USC §§ 423(d)(2)(B) and 1382a(a)(3)(G).

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability.  20 CFR §§ 404.1520 and 416.924.  If disability status can be determined at any step in the sequence, an application will not be further reviewed.  *Id.*  At the first step, if the claimant is currently

---

[21] Plaintiff applied for disability benefits under both the supplemental security income program, 42 USC Chapter 7, Subchapter XVI, and the disability insurance program of the Social Security Act, 42 USC Chapter 7, Subchapter II.  The latter is for applicants who have sufficient quarters of coverage from employment to qualify for insured status; the former is for persons who are not insured under the Act.  Virtually identical disability standards govern each program.

engaged in substantial gainful activity, then he is not disabled.  Second, if the claimant's

impairments are not severe, then he is not disabled.  A severe impairment is one that

"significantly limits [a claimant's] physical or mental ability to do basic work activities."  20

CFR §§ 404.1520(c) and  416.924(c).  Third, if the claimant's impairments, either singly or in

combination, meet or equal the criteria of any of the conditions included in the Listing of

Impairments, 20 CFR Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled.

The Listing of Impairments are medical conditions defined by criteria that the Administration

has pre-determined are disabling.  20 CFR § 404.1525.  If the claimant's impairments do not

satisfy a Listing, then his residual functional capacity ("RFC") will be determined for the

purposes of the next two steps.  RFC is a claimant's ability to do work on a regular and

continuing basis despite his impairment-related physical and mental limitations.  20 CFR §§

404.1545 and 416.945.  At the fourth step, if the claimant has the RFC to perform his past

relevant work, then he is not disabled.  Fifth, considering the claimant's age, work experience,

and education (which are not considered at step four), and his RFC, he will not be determined to

be disabled if he can perform any other work in the relevant economy.

The burden rests on the claimant to establish steps one through four; the  burden then

shifts to the Commissioner at step five to establish that there are jobs that the claimant can

perform in the national economy.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  If a

claimant has only exertional limitations, the Medical-Vocational Guidelines, 20 CFR Part 404,

Subpart P, Appendix 2 (the "grids"),  may be used at step five to arrive at a disability

determination.  The grids are tables correlating age, work experience, education, and RFC with

predetermined disabled or not-disabled findings.  20 CFR §§ 404.1569 and 1569a.  If a claimant

has non-exertional limitations or exertional limitations that restrict the full range of employment opportunities at his RFC level, then the grids may not be used and a vocational expert must testify regarding the numbers of jobs in the economy for a person with the claimant's particular vocational and medical characteristics.  *Id.*; *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993). The grid result, however, may still be used as an advisory guideline in such cases.  20 C.F.R. § 404.1569.

### Discussion

In this case, the ALJ found at step one of the sequential evaluation process that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  (R. 15, 26).  At step two, he found that she is status post-operative decompression, neuroplasty, and medial epicondylectomy of the cubital tunnel of her right arm; status post-operative decompression of the carpal tunnel of her right hand; status post-operative right elbow contracture release and right elbow neuroma; and that she has mild osteoarthritis of the left knee.  (R. 26).  He found at step three that she does not meet the criteria of any of the Listings, particularly 1.00B2b, 1.02, or 11.14.  (R. 18-20, 27).  For his steps four and five analyses, the ALJ determined that Plaintiff has the residual functional capacity to perform jobs at the light and sedentary exertional level.  He credited Dr. Lorber's opinions over those of Dr. Henderson and found that Plaintiff's reports of pain and other subjective symptoms were not credible to a disabling extent.  (R. 20-26, 27).  At step four, the ALJ found that Plaintiff could not perform her past relevant work, which was performed at the medium exertional level.  (R. 20, 27).  At step five, relying on the grid and the hearing testimony of the vocational expert, the ALJ found that there are numerous light and sedentary unskilled occupations in Indiana that Plaintiff can perform and, therefore, that she is

not disabled.  (R. 20, 28).  Plaintiff asserts several errors in the ALJ's decision.

**Ignoring evidence.**  Although argued in the context of either an erroneous step-three or credibility determination, Plaintiff generally contends that the ALJ ignored, selectively considered, or arbitrarily rejected evidence favorable to her disability.  An ALJ is not required to mention or evaluate every piece of evidence; it is sufficient if a reviewing court is able to trace his reasoning and is satisfied that he considered the important evidence.  *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995).

Plaintiff's copious lists of evidence assertedly ignored by the ALJ are unpersuasive.  We will not address each and every item but will summarize our consideration of all of them.  At pages 18-19 and 20-21 of her initial brief and pages 5-8 of her reply brief, Plaintiff lists several reports that she contends the ALJ entirely or partially ignored and that she asserts prove various significant points.  However, the ALJ in fact cited and discussed some of these reports in his decision, establishing that they were not ignored.  The ALJ is not required to repeat in his decision the content of every exhibit to avoid the error of ignoring evidence.  Plaintiff also argues that several of these reports "prove" her symptoms of pain, numbness, or other complaints when the reports actually only record Plaintiff's descriptions of these symptoms or the physicians' personal determinations of her credibility.  It is for the ALJ, however, to determine a claimant's credibility based on all of the evidence; he is not required to accept a physician's own belief in his patient's veracity or even to address it.  The evidence and testimony that the ALJ specifically cited and discussed adequately represent Plaintiffs descriptions of her symptoms; requiring the ALJ to cite or mention all of her descriptions would

15

be merely cumulative.

Plaintiff contends that the ALJ ignored medical findings of neurological processes in her arms dating from before her first operation.  But the ALJ accepted that Plaintiff had carpal-tunnel and cubital-tunnel syndromes involving neurological impingement and the additional relevance of the many "ignored" reports containing those diagnoses dating from before her first carpal-tunnel and cubital-tunnel surgeries is not evident and not explained by Plaintiff.  The several cited reports indicating the presence of arthritis in one or both of her knees were not ignored by the ALJ who acknowledged the objective indications of arthritis or degenerative processes in her knees and the contrary medical evidence showing no evidence of arthritis.  The relevant question, however — aside from their existence  — is the severity of those processes and their functional effects and Plaintiff's lists fail to explain or suggest how these assertedly ignored reports render erroneous the ALJ's evaluations of the whole body of evidence and his credibility determinations regarding symptom-related limitations.  There is more than substantial evidence and opinion in the record, from treating, consulting, and reviewing sources cited in our review of the evidence above, on which the ALJ indicated he relied, showing that any arthritis or degenerative processes in Plaintiff's knees was mild or minimal in degree with no reasonably expected functional impact.  No medical opinion in the record, based on a review of these reports, concluded that Plaintiff's knee condition was of disabling severity.  In fact, two of her treating physicians, Drs. Tumuluri and Whitaker, released her for work without restrictions relating to her knees.

Plaintiff has not shown that the ALJ failed to articulate his evaluation of important

16

evidence or that it is impossible to trace the course of his reasoning.

**Bias of Dr. Lorber.**  Plaintiff contends that it was error for the ALJ to allow Dr. Lorber to serve as the medical expert because he has a general anti-claimant bias, exhibited a specific bias and hostility against Plaintiff and/or her attorney, and based his opinions on only part of the evidence of record.  While one could characterize Dr. Lorber's interaction with Plaintiff's counsel at the hearing as brittle at times, it was so on both sides of the interaction.  It is the ALJ's responsibility to determine the qualifications of witnesses and he both denied Plaintiff's motion to exclude Dr. Lorber and relied on his testimony, thus clearly rejecting Plaintiff's assertion of inappropriate bias and hostility.  No evidence of general bias against claimants was presented and our review of the record does not reveal a lack of substantial evidence for the ALJ's decision to receive Dr. Lorber's testimony.  Finally, while it is true that Dr. Lorber's initial written opinion was not based on all of the evidence, this fact was addressed at the hearing, he corrected or revised aspects of his written opinion in light of the additional evidence, and he gave additional opinions based on a review of the additional evidence.  We find no grounds for error in the ALJ's decision to allow Dr. Lorber's testimony.

**Evaluation of subjective symptoms.**  Plaintiff contends that the ALJ failed to properly credit her allegations of symptoms.  Because of the inherent difficulty of evaluating disability due to subjective experiences such as pain and drowsiness, the Social Security Administration has established a protocol for the evaluation of symptoms.[22]  A basic principle underlying this

---

[22] Under the Social Security Act, "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment," 42 USC § 423(d)(1)(A) (emphasis added), and a physical or mental impairment is "an impairment

protocol is that "symptoms cannot be measured objectively through clinical or laboratory

diagnostic techniques . . . ."  Social Security Ruling ("SSR") 96-7p (Policy Interpretation —

Medical Evidence).  20 CFR § 404.1529(c)(3).  Because there are no objective medical tests for

the existence or severity of subjective symptoms, objective medical evidence can, at best,

provide indirect evidence of symptoms by detecting and measuring physical effects of the

symptoms, such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption.

*Id.*; 20 CFR § 404.1529(c)(2).  Another fundamental principle underlying symptom evaluation in

the regulations is the idiosyncratic nature of the perception and effects of subjective symptoms.

Individuals can not only feel significantly-different intensities of a symptom resulting from the

same impairment, but their functional limitations resulting from the same level of a symptom can

differ significantly as well.  SSR 96-7p.[23]

By regulation and internal rulings, the SSA has incorporated these principles into a

protocol for the evaluation of subjective symptoms:

> [S]tatements about your pain or other symptoms will not alone establish that you
> are disabled;  there must be medical signs and laboratory findings which show
> that you have a medical impairment(s) which could reasonably be expected to
> produce the pain or other symptoms alleged and which, when considered with all

_____

that results from anatomical, physiological, or psychological abnormalities which are
demonstrable by medically acceptable clinical and laboratory diagnostic techniques", 42 USC §
423(d)(3).  See also 20 CFR §§ 404.1505(a) and 404.1508.  Because a physical or mental
impairment resulting from physical or psychological abnormalities is required, disability cannot
be found on the basis of allegations of symptoms alone, regardless of their credibility.  An
impairment that causes the symptoms must be shown.

[23] "[A]djudicators must recognize that individuals may experience their symptoms
differently and may be limited by their symptoms to a greater or lesser extent than other
individuals with the same medical impairments and the same medical signs and laboratory
findings."  SSR 96-7p (Policy Interpretation).

of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

20 CFR § 404.1529(a).  This two-step protocol thus prescribes an initial objective threshold inquiry to ensure the existence of the required causal impairment.  Then guidelines and factors are provided to direct adjudicators' second-step evaluations of the credibility of claimants' allegations of the degree of symptoms and limitations experienced.  The second step of the protocol requires that all available evidence be considered in determining credibility, with objective medical evidence not accorded determinative weight:

When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work.  In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements from you, your treating or examining physician or psychologist, or other persons about how your symptoms affect you.

20 CFR § 404.1529(c)(1).  While the SSA will always seek and consider objective medical evidence — defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption" — it "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."  *Id.*, § 404.1529(c)(2).  Claims reviewers must consider all other relevant evidence, including evidence on the following factors:

(I)  Your daily activities;
(ii)  The location, duration, frequency, and intensity of your pain or other

19

symptoms;

     (iii)  Precipitating and aggravating factors;

     (iv)  The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

     (v)  Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

     (vi)  Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.);

     (vii)  Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

*Id.*, § 404.1529(c)(3).

After examining all the evidence, the adjudicator makes a credibility determination:

We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence . . . .  Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

20 C.F.R. § 404.1529(c)(4).  SSR 96-7p provides guidance on adjudicators' evaluation of credibility based on internal and external consistency, medical evidence, medical treatment history, observations of the claimant, and other sources.

Plaintiff argues that the ALJ "merely cited Social Security Ruling 96-7p without discussing the factors described in the Ruling and without providing any specific reasons for a credibility finding."  (Plaintiff's Brief, p. 24).  The ALJ, however, specifically listed the relevant factors of the Ruling, (R. 21), and included a sufficient discussion of the evidence relating thereto.  He discusses her daily activities, (R. 24), and the decision is replete with discussion of her many reports of symptoms, their degree, aggravating and mitigating factors, medications, and measures Plaintiff takes to accommodate her symptoms.

20

Plaintiff then includes another list of assertedly ignored evidence "providing objective evidence of her chronic disabling pain, numbness, tingling, and weakness of grip," much of it repeated from her other lists.  (Plaintiff's Brief, pp. 24-26).  By their nature, however, as recognized by the regulations and rulings, there cannot be direct "objective evidence" of the existence or severity of the subjective experience of symptoms.  Most of the cited "ignored" evidence merely records Plaintiff's complaints of subjective symptoms, presents the record-makers' own evaluations of her credibility, or includes medical signs or findings of conditions that are either undisputed or the rejection of which the ALJ has well discussed.

Plaintiff also argues that the ALJ erred when he discredited her reports of disabling symptoms because they were not supported by the objective medical evidence.  While particular phrases in his discussion include phrasing that might, in isolation, lend themselves to this interpretation, we are satisfied from a reading of his entire decision in context that the ALJ did not require objective proof of the degree of Plaintiff's symptoms, which the regulations forbid, but found her allegations not credible because of an absence of objective medical evidence of an impairment reasonably expected to produce the alleged type of  symptoms, inconsistency between the objective medical evidence and the degree of symptoms alleged, inconsistencies in Plaintiff's descriptions of the severity of her symptoms, and a lack of supporting evidence for the alleged severity of her symptoms and resulting functional limitations.  These are legitimate grounds for discrediting symptom allegations.

Substantial evidence supports the ALJ's finding that there was no objective medical condition to account for the pain alleged by Plaintiff.  As noted above, the only medical opinions

were that the arthritis and other conditions in her knees were mild or minimal; there was no

medical opinion that any condition affecting her knees was expected to produce the pain that she

alleged.  Her right-arm nerve impingements and other neurological processes were addressed by

her first surgery, there were sufficient records showing  that she reported no pain and took no

pain medication for her arms after the surgery, and she reported improvement with therapy.  Her

post-operative stiffness and contracture of her right elbow were addressed by the second surgery;

there were reports of improved range of motion during and after the procedure; and no objective

medical condition was found for her continued alleged limited range of motion.  Treating and

examining physicians released her to work with only right-arm limitations and sufficient

substantial medical and vocational opinion supports the ALJ's finding that the post-operative

condition of her right arm did not prevent gainful activity.

Plaintiff has not shown that the ALJ failed to properly and adequately evaluate her

credibility regarding the existence and severity of her symptoms.

**Dr. Lorber *vs.* Dr. Henderson.**  Plaintiff argues that the ALJ erred by giving more

weight to Dr. Lorber's opinion than to Dr. Henderson's.  The ALJ stated that credited Dr.

Lorber's opinion more because he is board-certified in orthopaedic surgery, which is the area at

issue, while Dr. Henderson is not.  Plaintiff faults this decision because the ALJ failed to

determine the board-certification status of Dr. Henderson or any of the other orthopaedic

surgeons providing evidence and because Dr. Henderson examined Plaintiff whereas Dr. Lorber

merely reviewed the documentary evidence.  There is no indication in the record that Dr.

Henderson is board-certified in orthopaedic surgery and Plaintiff did not suggest that he was in

22

her briefs.  She does not dispute that an absence of specialty in orthopaedics could be a legitimate factor in differentiating the weight accorded to the opinions of Drs. Lorber and Henderson in this case.  Moreover, Dr. Lorber's board-certification status was not the only ground on which the ALJ discounted Dr. Henderson's report.  He noted specifically that Dr. Henderson's reports of a reduced range of elbow motion and weakened grip strength depended largely on volitional responses by Plaintiff and there was no indication of the degree of Plaintiff's effort during the tests.  In addition, Dr. Lorber's opinion was based on his review of the whole evidence of record while Dr. Henderson's was based on only his own examination of Plaintiff.  Finally, the ALJ agreed with Dr. Lorber that there was no objective medical evidence of a cause for the severe limitations and symptoms alleged by Plaintiff and reported by Dr. Henderson.  On this record, therefore, substantial evidence supports the ALJ's decision to accord more weight to Dr. Lorber's evaluation than to Dr. Henderson's report.

**Twelve-months period.**  Plaintiff correctly argues that the ALJ failed to adequately address whether Plaintiff's elbow contracture satisfied the disability standard for a twelve-month period between her first operation on October 1, 2002 and her second operation on March 23, 2004.  The ALJ's discussion includes some indications that he discounted allegations and evidence of a limited range of motion and other symptoms because they dated before Plaintiff's second surgery in 2004.  There is no discussion by the ALJ and no medical opinion of record that Plaintiffs 2004 contracture-release operation was not necessary.  Plaintiff alleged an onset date of September 29, 2002, the last day that she worked, and she underwent her first cubital- and carpal-tunnel operation two days later.  She reported right-elbow problems, including stiffness, almost immediately after this surgery and she was referred to Dr. Whitaker at the pain

23

clinic for evaluation and treatment.  As late as December 2002 and January 2003, both Dr.

Tumuluri and Dr. Whitaker released her for work with right-arm limitations.  Sometime before

March 2004, it was determined that she needed contracture-release surgery on her right elbow to

relieve stiffness problems and there is some evidence that the problems were caused or

exacerbated by the first cubital-tunnel surgery in 2002.

We have found above that substantial evidence supports the ALJ's determination that

Plaintiff had not shown that she was disabled after her 2004 contracture-release surgery.

However, the ALJ does not explicitly address whether her elbow condition satisfied the

disability standard for any part of the period between her first and second operations and there

are more than twelve months in this interim.  We conclude, therefore, that Plaintiff's claim for

benefits must be remanded with instruction to the Commissioner to determine whether she

qualifies for disability benefits between October 1, 2002 and March 23, 2004, including any

appropriate period after March 23, 2004 for surgery recovery.  We do not instruct the

Commissioner to receive additional evidence; however, she might find it useful to seek any

additional records tending to show Plaintiff's condition at the time.

## Conclusion

Substantial evidence supports, and no legal error is found in, the Commissioner's

decision denying Plaintiff's application for disability benefits for the period after March 23,

2004.  Substantial evidence does not support the decision as it regards Plaintiff's right-elbow

contraction condition between the alleged onset date of September 29, 2002 and March 23, 2004.

This case will be remanded for further consideration in light of this decision.

24

Dated: 09/27/2006

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Patrick Harold Mulvany
E-mail: mulvany@onet.net

Thomas E. Kieper, Assistant United States Attorney
E-mail: tom.kieper@usdoj.gov